The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention. For the Court is now sitting. God save the United States and this Honorable Court. You may be seated. I want to welcome everyone to the Fourth Circuit Court of Appeals this morning. It's a pleasure to be with you all and Judge Richardson and I want to particularly express our appreciation to Judge Groh, the District Judge in the Northern District of my home state of West Virginia, who's serving on the Fourth Circuit this week. And we're honored to have Judge Groh with us. And we are also pleased to have all these good lawyers in these interesting cases. And the first case is number 23, 1941, Webb versus Lott. Mr. Lindeman, good to have you with us, sir. Thank you, Your Honor. May it please the Court, together with my co-counsel, my name is Andrew Lindeman and I represent Sheriff Leon Lott of Richland County, South Carolina. Your Honor, as this case comes to you, it's a bit of an oddity. It is a case where I represent Sheriff Lott, but we are highly critical of the actions and unfortunate actions of one of our deputies. This case is about the reprehensible conduct of a former deputy by the name of Cameron Duker, who was also a co-defendant in the case in the lower court, but not a party to the appeal. The case arises out of facts that occurred on February 1, 2019, when Deputy Duker was dispatched to the plaintiff's home. He was investigating a 911 call about an illegal use of an automobile, supposedly by Ms. Webb's brother. Ms. Webb made the 911 call. And ultimately, during the course of that visit to her home, things spiraled out of control, way beyond Deputy Duker's training. And ultimately, he placed Ms. Webb under arrest after tasing her a total of nine times. Five times with the stun drive and four times with the dart or probe. What is the difference between those things? It is like Greek to me. They used the four and five things. I don't know what the different types of tase weapons are, but I don't know what you mean by that. Well, we have cited this court's primary case on tasing the Armstrong case. And there is a footnote in that case that describes that. I understand all that, but I just don't remember what that is. I understand. I'm happy to explain it. A taser has two different components to it. One is called a stun drive, which is basically when the taser is placed on the skin, sends out a shock. It doesn't paralyze the person. It doesn't affect the nervous system, but it does create pain. And it's done for pain compliance. It's trying to use pain to obtain the compliance. The more common, at least layperson's understanding of a taser is when the taser is deployed and probes come out of the taser affixed to the body and shut down the central nervous system for a short period of time using electrical currents. So in this particular case, Deputy Duker used the taser in both methods. Initially with the stun drive for five times, then ultimately using the probe four times. Bottom line is the conduct was reprehensible. It was heinous. It was way beyond his training. And ultimately, when this case was brought, it was brought on a number of causes of action under Section 1983 against Deputy Duker, but also against Sheriff Lott for state law claims, for false arrest, negligence, as well as negligent supervision and retention. And so ultimately, there was initially a motion to try to bifurcate the state and federal claims, which was denied by Judge Michelle Childs for reasons of judicial economy and convenience. Ultimately, the case went to trial. It was tried, actually, by Judge Cameron Curry. And during the trial, well, she held a very extensive pretrial hearing, hearing motions in limine. There were motions made by Deputy Duker to exclude evidence that Sheriff Lott ultimately, well, within weeks of this incident, terminated Deputy Duker and not only terminated him, but also initiated criminal proceedings against him for assault and battery in the third degree and also initiated proceedings for the suspension of his law enforcement certification. And ultimately, all of that evidence was excluded based upon the motion in limine. It was excluded despite the fact that the plaintiff had argued earlier, in response to the motion to bifurcate and opposing that motion to bifurcate, the plaintiff indicated that she intended to put into evidence the assault and battery warrant against Deputy Duker. There was no assertions of any type of prejudice at that point in time. And so there are several different grounds for appeal that we have raised as a result of those preliminary proceedings  First and foremost, under the South Carolina Tort Claims Act, which is the governing law under South Carolina law for this particular claim, there are several immunity provisions under Section 1578-60, subsection 17. One of those provides absolute immunity for conduct that constitutes a crime of moral turpitude. That's one of the principal arguments that was asserted at trial in defense of Sheriff Lott. And ultimately, after all of the evidence was in, Judge Curry granted the plaintiff's motion for judgment as a matter of law on that particular defense and excluded that defense.  And part of her reasoning, she didn't state her reasoning during the trial, but in response to post-trial motions, she indicated that there wasn't evidence to support the crime of moral turpitude. Well, one of the reasons for that, even though, quite frankly, our argument is twofold on that, number one, there was sufficient evidence that was admitted into evidence, and I'll get into that in a moment, to support a finding that this conduct by Deputy Duker constituted a crime of moral turpitude under South Carolina law. But even if it didn't, even if, I mean, excuse me, even without the, and I'm suggesting that without the evidence of the fact that a charge was brought, his termination and the suspension of the law enforcement certification. But alternatively, if the evidence that was admitted into evidence wasn't sufficient, if she would be right in that regard, part of the problem, and in fact a significant part of the problem, is that she excluded the evidence that I just spoke about, which was evidence of his termination, evidence of the criminal charge that was brought and prosecuted, and evidence of his suspension of his law enforcement certification. Counsel, when you start talking about whether it's a crime of moral turpitude, can you help me understand how we know when assault and battery is a crime of moral turpitude? And start with the premise that the Supreme Court said in Bailey, which is that assault and battery is not always a crime of moral turpitude. It depends upon the facts or circumstances. But the Supreme Court hasn't been super clear about what those facts or circumstances are in the assault and battery context. Can you tell me from your perspective what circumstances or factors distinguish an assault and battery that's not a crime of moral turpitude from one that is a crime of moral turpitude? Well, and quite frankly, Judge Rich, I don't think it's difficult to make that determination in this case, given the egregious facts. I want to know what the standard is. I understand that you think you win. I understood that when you stood up. You think you win, I got that. I'm trying to understand, what is the standard that you want us to apply? Not the result, but why would any give an assault and battery? Because we know some are and some aren't. And so the question is, how do we distinguish between those that are strictly with assault and battery and which ones are not? Well, you obviously have to look at the facts of the case. In the Bedora case, the South Carolina Supreme Court tried to, and actually I think did a good job of clarifying the law in South Carolina as to what constitutes a crime of moral turpitude and what doesn't. But they still recognized, in fact, there's still language in Bedora where the court says, making the issue somewhat more complex, South Carolina courts have held whether some offenses are a crime involving moral turpitude can depend on the facts of the case. And in this particular case, the Bedora case, which of course was not an assault and battery case, but it was something analogous, which was criminal domestic violence. Which is a form of assault and battery. It doesn't use the words assault and battery, but criminal domestic violence is a form of assault and battery. That's correct. As a specific type of it. And so that's why I think Bedora really clarified the law, particularly for its application in this case. And what part of Bedora, what is the test that you want to take out of Bedora that distinguishes an assault and battery that is and an assault and battery that's not? Well, the court did look at and said, even though typically injury is not required to be a crime of moral turpitude, when there is physical injury, even moderate physical injury, there is a crime of moral turpitude. Obviously, the physical injury. So you think you think Bedora teaches us that any time there's physical injury, it's a crime of moral turpitude because the Supreme Court has said, for example, that voluntary manslaughter and involuntary manslaughter, which both obviously involves serious physical injury, are not crimes of moral turpitude. And that suggests that that line is not is not a way to distinguish between crimes of moral turpitude. And I recognize the confusion with older law. Of course, there's I don't believe that there's a case since Bedora came down that found that voluntary manslaughter or involuntary manslaughter does not constitute a crime of moral turpitude. So I'm not certain under Bedora that that won't be revisited, first of all. But Bedora is at least factually very close to this case, actually. So your position is that we can distinguish between an assault and battery. That's a crime of moral turpitude based solely on whether physical injury occurs. Not solely. That's one component of the analysis and certainly not the entire component. It is neither necessary nor sufficient in your view. Correct. And of course, in this case, you have. Can you point to something that is either necessary or sufficient? Well, the court went on to talk about their focus. And in fact, they got away from the past, what they called the traditional framework, and in fact rejected the the Oklahoma law on this. And they indicated, and this is a quote, that you look at the actual effects on society and effects on man. And in particular, this case has all of those components as well, because we're dealing not with an assault and battery of one citizen versus another. We're talking about an assault and battery committed by a police officer. This is a case of police brutality. Let's face it. That's what this is. And ultimately, obviously, in 2019, that was a very sensitive subject. And I believe that the South Carolina Supreme Court would recognize that the facts of this particular case, the conduct of Deputy Duker would absolutely satisfy the test following the Bedora framework. Clearly, you've got a police officer who's sworn to uphold the law, is violating the law, and he's not violating the law in some minor, insignificant way. And obviously, he's violating constitutional rights as well, which has obviously been proven. But this is egregious conduct, and it's not questionable conduct. It is all caught on video. So again, the run-of-the-mill assault and battery claim between private individuals might present a much closer question. I don't believe that this, and I would submit to this court, does not present a close question at all, particularly given the fact that Bedora has clarified that criminal domestic violence in the second degree is sufficient to be a crime of moral turpitude. And so that last piece, which I think you described as the effect on society, are you suggesting here, I guess, I didn't read your brief as making the argument that there was some special relationship between every police officer and every citizen that would create a relationship like a husband and wife in Bedora. Have you made that argument, which is what you seem to be suggesting, or maybe not? I did not draw an analogy between husband and wife that police officers have that type of duty. It's a different duty, but it is clearly a duty to society. The language that I was searching for and didn't find, it says, and this is from Bedora, under South Carolina's moral turpitude framework, we focus primarily on the duty to society and fellow man that is breached by the commission of this crime. Well, but there's a moral duty in society to not beat up other people, right? A random person on the street. We have a duty in society to not just senselessly attack random people walking down the street. I agree with that, but I would suggest to the court, and I don't think this is a stretch by any means, that there's a heightened responsibility that police officers who are sworn, as I said, to uphold the law should not be violating the law. And I do believe the egregious facts of this particular case. Well, it's everybody's obligation not to violate the law. Well, certainly. Is your challenge in here, is this an evidence ruling? Well, it's multi-part. It's, number one, that there was sufficient evidence to support a finding of a crime of moral turpitude based on the evidence that was admitted. Secondarily, the fact that Judge Curry did not allow it. I see my time's up. No, but you go ahead. As long as you get questions. The second part of that is Judge Curry erred in excluding evidence so that the record and the jury did not hear evidence that a criminal charge was actually brought, was prosecuted, that the deputy was terminated. And that's the primary thrust of what you're after. Exclusion of evidence. There's exclusion of evidence, but also the argument that even without that evidence, there was enough evidence in the record not to strike that defense at the judgment-as-a-matter-of-law stage. In addition to that, the problem is that she was favoring one defendant over another by finding that that evidence was too prejudicial to be admitted into the case involving Deputy Duker. Can I ask just one more question before you finish? Sure. Are you arguing, you suggest here, I didn't gather this from the briefs, but you suggest here that there's a special relationship between a police officer and the citizens and their obligation to not violate the law. Is your position that that relationship would make any assault and battery a crime of moral turpitude if it was done by a police officer? So if it wasn't excessive, if it wasn't this type of, you know, they didn't use a taser at all, but he just unlawfully grabbed her by the wrist to restrain her, but assume it was unlawful for some reason. That any assault and battery by a police officer would be a crime of moral turpitude based on the nature of the relationship or the duty that a police officer owes? And again, just to clarify, I think the duty is part of the equation. I know, but what I'm asking is if that was all we had. It's a hypothetical, right? So instead of using a taser, right, and doing the things that were done here, I understand the degree of assault and battery is significantly different. But in my hypothetical, it's literally just grabbing her by the wrist, but no harm, no pain, no nothing, but grabs her by the wrist, but does so without justification, right, with no probable cause or reason for doing so. That would be an assault and battery. And the question is, is that a crime of moral turpitude because of the duty that a police officer owes to follow the law? No, I would not think so. And just real quick, and then I'll let you sit. Sure. Why not? Because one of the components of it is that there should be some at least moderate physical injury, and I'm not talking about a sprain or something along those lines. So it's the nature of the relationship plus injury. That's right. There are a number of different components. And, of course, that does make it a little bit more complex because it is fact-based. And as the South Carolina Supreme Court has continued to say, it's fact-based. But, again, not to belabor the point, I don't think you have to draw those lines in this particular case so finely because the actions here are just so egregious that if the actions in Bedora for criminal domestic violence satisfy a crime of moral turpitude standard, clearly we have that in this particular case because you have significant injury, you have conduct that vastly goes beyond any policy, any police training, and you've got the added component of the duty that's owed to society. So you have all of the totality of those circumstances in this case does not make this a close case. And this case doesn't require, I would submit, this court to draw those lines. And, ultimately, I think you're going to see in South Carolina that a lot of prior law is going to be revisited. Misconduct in office is also something that, depending on the facts, can be a crime of moral turpitude. In this particular case, Duker was not charged with misconduct in office, but very often you see that with police officers, the charges of misconduct in office or with correctional officers. Now, did we review this contention of yours for abuse of discretion? Well, it's sort of a mix. Obviously, abuse of discretion would apply to the evidentiary. This is a ruling of Judge Curry we're reviewing. You mentioned Judge Childs earlier. It would be a contention you're making about a ruling of Judge Curry, correct? And we're also challenging the denial of the motion to bifurcate by Judge Childs. That would have an abuse of discretion standard. The evidentiary issue would have an abuse of discretion standard. Of course, the judgment as a matter of law striking the defense based on immunity for crime of moral turpitude, that would be de novo. If we find that the trial court judge properly excluded evidence of the deputy's termination and prosecution, does that make your bifurcation argument moot? It likely does. But ultimately, we would still have the argument, number one, as far as that there was sufficient evidence even without the evidence that was excluded on the crime of moral turpitude. And then we also have the issue with the charge that was the fourth issue in our brief that we haven't even touched upon. You've got a jury instruction there. Yeah, the jury instruction there on false arrest. And that's an abuse of discretion issue, too. Well, I think that would be de novo as a matter of law because she's made an error of law in how she charges. If it's an abuse of discretion, you might have an error of law to use as a hook or something. But anyway, we need to see what the other side is going to say about this. Thank you, Your Honor. Mr. Truelock? Truelock, Your Honor. Yes, sir. Mr. Truelock, good to have you with us. Thank you very much for having me. May it please the court, Your Honor, unless I'm questioned otherwise, I would like to address the appellant's arguments chronologically, first addressing the bifurcation issue, Your Honor. Respectfully, Your Honor, I don't believe that this issue is preserved because Judge Childs, subject to an abuse of discretion and clear in judgment, was never presented with the issue of whether or not the trial should proceed with the issue that Mr. Lindemann brought to the court about, the exclusion of the prosecution evidence, the evidence that was, while I'm not saying it was untrue, but was fabricated and created by the Sheriff's Department many weeks after the incident in this case occurred, which was by swearing out a warrant for his arrest, seeking his suspension and seeking his termination. Your Honor, Judge Childs never had any opportunity to review that issue. Now, I respectfully submit that even if that issue was before her, that she would not have committed any error of law based on fact or otherwise, because that evidence was properly excluded, but she did not get an opportunity to resolve that, and her order is very well thought out, it's sound, and so I respectfully submit that to the extent that the appellant is arguing that that evidence should have been considered or somehow tainted the bifurcation issue, Judge Childs had no idea that Cameron Duker, the individual officer, was going to move to exclude that evidence approximately six months later, and of course after the case had been transferred to Judge Curry. Additionally, Your Honor, to hold otherwise would require even Judge Curry to constantly monitor the case for changes in evidence or other factors that might come into play in considering a previous motion for bifurcation, Your Honor. So I respectfully submit that Judge Childs at the time considered everything that was properly before her and made a proper ruling that was not a clear error of judgment, Your Honor, subject to a standard of abuse of discretion. I'll be happy to go into the finer points of the actual motion, what was actually addressed, what the plaintiff's representations were, and what Judge Childs' determinations were. Your Honor, given the limitation of my time, I'll happily move on to the other issues if there are no questions on that, Your Honor. You go do whatever you want. What's best. Thank you, Your Honor. Go ahead. Your Honor, the next- Respond to questions. Go ahead. Yes, Your Honor. Well, and let me tidy that up a little bit. I would say also with regard to the motion for bifurcation, Your Honor, the issues that were submitted, if you look to Joint Appendix page 108, they talk, you talk about the affirmative defense as some, and I know that you all have read my brief and that I'm concerned about the issue of crime of moral turpitude ever having been properly raised to the court, either in the answer or even by some other standards of leniency that allow them to raise that issue outside of the answer. That issue was actually excluded in the motion for bifurcation. They listed the other affirmative defenses that were submitted to the jury. So if you talk about a crime of moral, and Judge Curry found it had been raised and we could sort of review that question. But if we reach the question of whether this is a crime of moral turpitude, can you tell me how you think the line should be drawn? Because Bailey tells us that assault and battery sometimes is and sometimes is not a crime of moral turpitude. And in that instance, it was assault and battery of a high and aggravated nature, which requires a more significant injury. And so we know that the injury, the existence of some injury, isn't the distinguishing factor based on Bailey. But can you tell us from your perspective, what does distinguish an assault and battery that counts versus one that does not count? If I can answer your question in two parts, Your Honor. Sure. The relationship between the parties, not necessarily that it's just special, but the court seems to be concerned with that in the domestic violence situation that clearly a spouse will repose a special trust in the other spouse who commits an assault and battery on them. I know that the appellant is arguing there's a special relationship in that regard in this case. And I've noticed your questions. I don't think that the case intended to make all law enforcement officers have that special relationship with citizens. So I do think. Well, they have an obligation to protect the public. Yes, Your Honor. Of course, Your Honor. But also the public duty rule would say that that responsibility isn't foregoing. It actually becomes consequential once they become involved with the individual citizens. The second point, Your Honor. But this is all about after he became involved with the citizen, right? Absolutely, Your Honor. And to answer the second part, Your Honor, I respectfully submit that the Badour case and other cases of the commons do give you additional guidance. And I think both parties would agree that it's difficult to nail this down, but give you additional guidance and then they give you guidance with regard to the mental state of the person who is supposed to have been violating this relationship, which is violence, depravity, and baseness, Your Honor. And so it imposes not just a violation of the relationship and harm, but also says that they are doing so with an evil intent, a vileness, a depravity, a perversion, so to speak, Your Honor. So I think that the relationship existing between the two parties that I respectfully submit would be far more than an officer and citizens. Where that line is, I do not know, Your Honor, but I respectfully submit it is not officers and citizens. But beyond that, that whoever is in a relationship that would qualify Iran-Badour, that they are acting with a sort of mental state that makes the violation of that relationship particularly egregious. So you put the two together, the relationship and the mental state, but the court has said, just to take example, that murder is a crime of more turpitude, even though there need not be a special relationship between the murderer and the victim. So it seems like there's like a, I just wonder if you think they have to be together, or whether there's a set of cases that are about a special relationship, a husband and wife, for example, and then there's a separate set of cases that are about malice or intent or some sort of depravity. I do think there's a separation, Your Honor. Because that's the line between murder and voluntary or involuntary manslaughter. There's no relationship there, but there's a distinction in what's a crime of moral turpitude based upon the intent of the actor. Yes, Your Honor. I do think there is some difficulty there, because if we look at Badour, Badour wasn't trying to answer the question of what is crime of moral turpitude under the South Carolina Tort Claims Act. It's a much more nebulous understanding that's very fact-specific. And when you look at the crime of moral turpitude and we look at what the definition of that is, it doesn't go into a very expansive set of examples of when it's going to fit and when it isn't. So have you argued, I noticed that, so it comes up in, it seems like four different ways in the South Carolina court system, attorney discipline, rules of evidence 609, at least the old version, the constitutional provision, which is in Badour, and then we got the Tort Claims Act. Do you think that those are different? They all use the same phrase? Obviously, the constitutional provision, they're enacted at different times. Is there any reason to think that South Carolina would not interpret all four of those circumstances in the same way? I mean, it seems like we could use Badour, even though it's the removal provision, to understand what crime of moral turpitude means in the Tort Claims Act provision, right? Yes, Your Honor, and if I understand your question, I don't know that all of them can be reconciled together because, again, the issue that they're concerned with is not the application of this with regard to governmental employees. I think that's difficult to say, and I'm certainly not prepared to reconcile all those cases. I cannot do that. What I would submit to Your Honor is that violence, depravity, and baseness is an element, and in this particular case, it's particularly relevant because the evidence was insufficient with that regard, and also, Your Honor— Why is that? Why was the evidence insufficient? I mean, we watched it. I mean, this is pretty bad, right? I mean, we see lots of these, and if this isn't depravity, it's a little hard for me to know what would count. Yes, Your Honor. I mean, it's almost worse than just a single shooting, right? Like, a single shooting might have been a terrible decision, right? It obviously has catastrophic consequences, but this is like a repeated, like, abuse of an— I'm going to use the term elderly because I have Judge King with me, but an older person. Yes, Your Honor, and I think the difficulty in that is that you've had an opportunity to watch the video, but Your Honors have not had an opportunity to witness the testimony in court or the questions in the context that they were given. I totally get that, but I can watch the video, and I can listen to the testimony and just not believe it, right? He says, I didn't intend to harm her. I was doing everything I thought was right. I was trying to just do this, and I can, as a reasonable juror, could just say, that is absolutely false. Like, that does not match with the evidence. It's like, it's the equivalent of the officer who testifies, he raised the gun to shoot me, but it turns out the guy was shot in the back, right? In that scenario, the physical evidence just contradicts and at least would permit a reasonable jury to find that his claims that he had no malice or intent to harm are false. Well, Your Honor, those issues were submitted to the jury. I understand that. That might be a different question. But the question is whether the judge was right to take that question away from the jury. The jury, I get, reached the result that it did, but the judge at the J-Mall took the question away from the jury as to whether, on this point, but gave it to the jury on the other point. That's the oddity to me. Your Honor, the problem with watching the video is that we have a very difficult time finding out exactly what Cameron Duker was thinking about the time when he was committing these, as you say, very difficult to watch acts. In every case, we have a hard time figuring out what's between the ears of somebody. Exactly. That's why we have courts. Exactly. But we often say that one's actions speak louder than their words. And so we can look at the actions here, and a reasonable jury could, for purposes of the J-Mall motion, I understand a jury ultimately resolved this a different way, but a reasonable jury could have found that this was base, vile, malicious, and done with an intent to harm. Your Honor, I would submit that if the jury did find that in this case, then they would not have been listening to Cameron Duker's supervisor's testimony about how he is an honest person, that his testimony was reliable, and that he believed, without any prompting from the questioner, that he didn't believe this act was immoral.  But the point is, like, the jury was entitled to believe that or not believe that is the rub, right? I understand that, like, the officers come together and they say that there was no intent to harm, and that might be totally right, but I don't see why a jury is bound to that conclusion, given the video evidence that we've got here. I understand, Your Honor, and looking at it from a damages perspective and what was happening, I understand that it's difficult to separate the two, and I believe that it was possible to do so, Your Honor, with the testimony at trial. Is there any other way to frame what we saw in that video? In what regard, Your Honor? As far as watching and taking us through that deputy's actions? Your Honor, in an attempt to answer your question, I would say that listening to what the officer was saying at the time when it was happening, I believe he was repeatedly saying, stop resisting, words like careful, words like ma'am. What he was doing was, I agree, it was terrible to watch, but he was consistently displaying what he was thinking by saying things like that. If he had issued some terrible statements about the person that he thought that were inappropriate, I think that would have driven the case in a completely other direction. But when you watch the video and you listen to what he's saying, which helps you figure out what he's thinking. But when he says stop resisting, she's curled up on her bed. Yes, Your Honor. He clearly was an inept officer in this role. But again, it's clear that what is coming out of his mouth when he's doing this are concerns about whether or not he has the probable cause to continue to make this arrest, that he thinks he's making a lawful arrest. And also, if you look at the video immediately after he's separated from Mrs. Webb and the conversation he has with Corporal Fairbanks, Corporal Fairbanks is clearly exasperated about what's happening. But you can also tell that Cameron Duker is also what I would describe as afraid. He is not acting with the intent to actually harm her. He's not acting with vileness. It is clear that he has gotten himself in a situation that he simply did not understand the consequences of, Your Honor, with the consequences of which were very severe. And the issue here is an evidence admissibility issue? Your Honor, that does tie to just about... Is that your characterization of it? That is one of the two major ones I would say, yes, Your Honor. Is it reviewed for abuse by us for abuse of discretion? The exclusion or admission of evidence, yes, Your Honor. So we give deference to the trial judge? Yes, Your Honor. Can I ask a follow-on? Hypothetically, so stay with my hypothetical. Hypothetically, if I thought the district court erred in granting a judgment as a matter of law on the moral turpitude question, could we find that error to be harmless given that the jury found no malice or intent to harm here? In other words, could one believe that the district court erred in taking that defense away from the jury, but that the jury's findings of no intent to harm or malice render that error harmless? Because that finding would have also required them to find that there was no crime of moral turpitude. I would absolutely respectfully submit that that is the case, Your Honor. The first and foremost affirmative defense of acting outside the course and scope of official duties, that they found that he was in the furtherance of the sheriff's duties, that alone, Your Honor, would put a shroud over all the other affirmative defenses. That they found that he did not commit malice, which in some of the case law, I believe it's the Tate case from South Carolina, talks about malice being a forerunner to depravity. So, Your Honor, I would agree with that conclusion, Your Honor. Because that's a lower burden affirmative defense. Because, yes, Your Honor, violence and depravity would be, I would say, incorporated within this course and scope of furtherance of duties. Yes, Your Honor. Your Honors, in addition to my arguments that I previously mentioned about the issue of preservation of bifurcation between or before Judge Childs, I also submit that the issue of judgment as a matter of law is also not properly preserved where when the plaintiff then, Your Honor, Mrs. Webb, moved for judgment in that regard, she argued that there was no violence, depravity, or baseness. The response to which was not... You're saying it's not preserved, so you're saying we've got to review it for some kind of plain error doctrine or something? I would submit that, yes, Your Honor. The response, although there was clearly a response from the appellant to that motion, the response simply was inapplicable to the motion as a matter of law. The motion as a matter of law said the element that was missing was violence, depravity, and baseness. The response was that there was evidence of a breach of social contract. Your Honor, I had... Your Honors, I had a very difficult time trying to pin down a case that could really address this issue. I think it's aided by precedent, but there's not one specifically on point. But in this case, the response was not... The rebuttal was not even a general objection. It wasn't, Judge Curry, there exists some evidence or there exists evidence. Moving on, there was this breach of social contract based on the testimony. It was there was a breach of social contract, and the standard that was submitted to Judge Curry that was agreed upon as a jury instruction, consented to by the parties, was that there is at least two elements to crime of moral turpitude, violence and depravity, which is the mental state, and of course a breach to society, a breach of sort of trust, and the rebuttal to that motion was only there exists a breach of special relationship. There was no response at all, and this was to my surprise in reviewing the record, to the argument that there existed no evidence of violence and depravity. Right, but this is what's odd to me. Judge Curry says there's no evidence of an intent to harm. She makes that conclusion in order to reject that there's no depravity. That's the basis on which she finds, and yet you watch the video, and it's hard for me to say as a matter of law that no jury could find that there was malice and intent to harm. I mean, if you can't find it based on that video, then what you're saying is any time an officer testifies, I had no intent to harm, then it's okay. No matter how bad the beating, no matter how bad the tasing, no matter how bad the circumstances, like we have to take the officer's word that he had no intent to harm? That seems like a really odd standard, and I understand you've got this case that you're trying to win, but you try these cases all the time. There's no world that we would say in another context that a judge has to take the officer's word that he had no intent to harm, given the physical evidence that we've got here. And, Your Honor, I agree with that. I would find it extremely disturbing if that's how it operated. Again, Your Honor, it didn't work that way. But that is what the district court did here. The district court said there's no evidence of intent to harm, and so that's why I'm granting the JML. Your Honor, my recollection of the record is that there was no evidence supporting the crime of moral turpitude. The jury determined there was no intent to harm. No, no, but why did Judge Curry find there was no evidence that there was a crime of moral turpitude? On what basis? Your Honor, in her order, she stated that the evidence of violence and depravity simply was not present here. Right, but why? I would say because it wasn't present, Your Honor. No, no, that's just circular, right? I understand, Your Honor. That's just like a conclusion. I understood her to be saying, and I won't go back to it because we only have a few seconds here, I understood her to be saying there was no evidence of intent to harm. Right, but that conclusion, it might be a harmless error, but that conclusion seems wrong given the video we've got. As compared to the statement, and the jury was entitled to believe one or the other, and we know the jury believed that there was no intent to harm or malice. I get that, and it was within the scope of his duties. I get all of that, and so maybe the jury found it, but the preceding question of the judge deciding that there was no intent to harm based on the testimony despite this video seems like a harder line to draw. And again, Your Honor, I completely share your understanding. The problem is that when you heard Corporal Fairbanks combine with then just Cameron Duker's testimony, it came off that way, Your Honor. He seemed to be very honest and unequivocating in his responses. Totally fair, right? But that's then the judge weighing their credibility, right? So they come across as really honest and trustworthy. That's sort of what we have juries for, right? Generally speaking, we don't let judges say, yeah, maybe you could disbelieve some other officer, but we got two officers this time, and they seem really trustworthy, so we'll believe them here. Yes, Your Honor. I can just only respectfully submit that the evidence of how disturbing this video was was not enough to get to vileness, Your Honor. And I understand that it's a disturbing video. I agree with that. But without some aid from the testimony that determining the mental state just wasn't possible, Your Honor. My time has run up, Your Honors. If there are any other questions for me, I'm more than willing to submit myself to them. Thank you very much, sir. Thank you, Your Honors. Commissioner Lindeman. Thank you, Your Honor. Let me start with this point. When she granted judgment as a matter of law on the moral turpitude defense, she didn't give her reasoning. And certainly her reasoning could not possibly have been at that stage that there wasn't evidence of intent to harm because she allowed the intent to harm component of 157860, subsection 17, go to the jury for a determination. So clearly that was not the basis. I would also submit, and I think this is extremely important, is that assault and battery with a third degree does not require intent as a criminal charge in South Carolina. The following is how the crime is described in section 16-3-600E1. It says, a person commits the offense of assault and battery in the third degree if the person unlawfully injures another person or offers or attempts to injure another person with the present ability to do so. And that's on page 24 of our opening brief. And so there is no mens rea that's required there. We're not limited to assault and battery third, right? That's what he happened to be charged with. That's correct. But our question is whether the conduct engaged in by the individual, here the officer, amounts to a crime of moral turpitude. And so we're not limited to the crime that was actually charged. What we would, in theory, do is we'd go look at the South Carolina criminal code and we'd find the crime that most closely fits what fit here. And maybe it looks like ab hand, maybe it looks like assault and battery second, whatever we might want to say. And the question is whether that is a crime of moral turpitude. We're not limited to what the solicitor here happened to choose to charge, right? I totally agree with that. In fact, in a footnote, we do raise the statutory and common law offenses of misconduct in office. And, again, there's case law predating Bedora, so it hasn't been clarified by Bedora, but finding that misconduct in office, given the facts, can be a crime of moral turpitude. And so, again, it's the egregiousness of the facts in this particular case that I would, again, submit doesn't even make this a close call, doesn't require any type of drawing of lines by this court or trying to establish any South Carolina standard. What's your response to the question that I asked your colleague, which is maybe the district court erred in excluding the crime of moral turpitude defense, but given the nature of assault and battery and the way we distinguish between a crime of moral turpitude and not, that we know the jury would have had to have found, given its findings on official duties, malice, and intent to harm, that there was no crime of moral turpitude here? Well, I think, again, that's a stretch, because at the point in time that that defense was stricken, Judge Curry allowed the others to go to the jury. Totally fair, and hypothetically accept that that was an error. But the jury then came back and found no intent to harm, no malice. This was acting in the scope and in furtherance of the sheriff's official duties. Those findings alone are more difficult than what would have been required for a crime of moral turpitude. Well, I'll go back to my previous point that, number one, mens rea and intent to harm maliciousness are not elements of the criminal charge, number one. Number two, the jury didn't have the benefit of that. We're asking about the facts, right? So what Bailey tells us is we look at not the elements of the crime, but the conduct, right? So we look at whether he acted with a depraved heart, right? And the other point I'd make sure the court's aware of is, number two, the jury wasn't charged with the law on crime of moral turpitude, and no argument was able to be made in closing argument on that particular point. But if it's an included defense, so in other words, what I'm trying to ask you, is there any way that a jury could find no malice, no intent to harm, but instead action in furtherance of the proper duties of the sheriff? Could those findings be squared with a jury finding that this is a crime of moral turpitude? It seems like those former exclude the latter. No, absolutely. Why? And I would submit that this is a case that shows that, because the conduct could be so egregious that even if it wasn't intended and wasn't determined to satisfy the standard of actual malice under the Tort Claims Act, would be still sufficient to be a crime of moral turpitude. I don't understand why that is. I guess maybe that's the rub. Well, again, I go back to the point that it's not an element of the particular crime that it be an intent crime. In this case? In this case. You're telling us that intent to harm doesn't matter? No, I'm saying if you're judging whether or not assault and battery of third degree was committed here, it didn't require a proof of the officer's intent or mens rea. So ultimately, he can be found liable or be convicted of that particular charge without that evidence. And without any malice. And without any malice. And it can be a crime of moral turpitude. But you acknowledge that we don't look to the elements of the crime, right? That's what the court tells us in Bailey. I'm just saying what the South Carolina court says. In federal court, we apply this categorical approach all the time, right? And we all dislike it, but we do it. But South Carolina, maybe wisely, says for the common moral turpitude, we don't look at the elements of the crime. We look at the facts of the conduct. Well, I don't think you look solely at the facts of the conduct. You look at the elements of the crime. There has to be a crime, I would submit. There has to be a crime.  Right. And whether it then rises to the level of a crime of moral turpitude is a fact-based analysis. And I see my time's up. If I could make one additional point that was raised by a question, I think, from Judge Richardson. Ultimately, the crime of moral turpitude is used in the Tort Claims Act. It's obviously something that comes up, as you recognized, in evidentiary procedures and criminal cases as well. But it does not have a unique definition under the South Carolina Tort Claims Act. And, in fact, I would remind the court that inherent in the Tort Claims Act is a statutory construction provision stated actually in the statute that says the statutory terms are to be liberally construed in favor of limiting the liability of the governmental entity. So, ultimately, a crime of moral turpitude is going to be construed consistent with Bedora, I would submit. And I do believe that showing has been made here. We would ask the court to please reverse the lower court. Thank you very much. Thank you, Mr. Lieberman. We'll come down and greet counsel, and then we'll go to our next case.
judges: Robert B. King, Julius N. Richardson, Gina M. Groh